UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MICHAEL MILICI,

                           Plaintiff,                         **MEMORANDUM & ORDER**
                                                              19-CV-2883 (PKC) (ST)

            - against -

WILLIAM BRATTON, *Former Police
Commissioner*; LAWRENCE BYRNE; JOHN
DOES #1–5; CITY OF NEW YORK,

                           Defendants.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        Plaintiff Michael Milici initiated this action on May 15, 2019 against Defendants William

Bratton, the former Commissioner of the New York City Police Department ("NYPD"); Lawrence

Byrne, the NYPD's Deputy Commissioner of Legal Affairs; five unidentified NYPD Officers who

allegedly assisted Commissioner Bratton in deciding to terminate Plaintiff's employment; and the

City of New York ("the City").  (Complaint ("Compl."), Dkt. 1, ¶¶ 4–5, 19–21.)  Before the Court

is Defendants' motion to dismiss this matter for failure to state a claim upon which relief may be

granted, and, in the alternative, to dismiss this matter as to the individual Defendants because they

are entitled to qualified immunity.  (Defendants' Brief ("Defs.' Br."), Dkt. 29, at 5, 14.)  For the

reasons set forth herein, Defendants' motion is granted in full.

## BACKGROUND[1]

In 2016, the United States Attorney's Office for the Southern District of New York ("SDNY")[2] initiated a federal criminal probe that investigated two political bundlers for Mayor De Blasio: Jona Rechnitz and Jeremy Reichberg. (Compl., Dkt. 1, ¶ 27.) The probe revealed that the two political bundlers "were trading cash, political donations, gifts, food, and vacations to the NYPD and other City officials in exchange for unprecedented City access," which was comprised in part of access to the NYPD, including "private police escorts, fixing and avoiding driving violations, street closures/permits, VIP Access to parades/events, and gun licenses to unqualified applicants." (*Id.*) The probe extended to a number of NYPD officers. (*Id.*)

## I.     Plaintiff's Termination

At the time Plaintiff's employment was terminated by the NYPD, he was a Second Grade Detective who had a pending application for a promotion to First Grade Detective. (*Id.* ¶ 25.) Prior to his termination, Plaintiff was an officer at the 66th Precinct, through which position he met Reichberg. (*Id.* ¶ 28.) On or about March 31, 2016, in connection with the probe, Plaintiff was subpoenaed to testify before a federal grand jury in the SDNY.[3] (*Id.* ¶ 29.) Upon advice of

---

[1] For purposes of this Memorandum & Order, the Court assumes the truth of Plaintiff's non-conclusory, factual allegations in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (citing, *inter alia*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[2] The Court assumes that the complaint's references to the "SDNY" refer to the United States Attorney's Office for the SDNY.

[3] While Defendants assert that the Court may take judicial notice that Plaintiff is "an unindicted co-conspirator in the criminal corruption case brought against ex-NYPD Deputy Inspector James Grant and Brooklyn businessman Jeremy Reichberg" (Defs.' Br., Dkt. 29, at 3 n.3), Plaintiff alleges that he "was never convicted of any crime, never accepted any bribes[,] and never engaged in any illicit sex acts with prostitutes," (Compl., Dkt. 1, ¶ 10). The Court need not determine whether it may take notice or consider these facts, as they are not relevant to the resolution of Defendants' motion.

counsel, Plaintiff exercised his Fifth Amendment right not to testify before the grand jury. (*Id.* ¶ 29.) Plaintiff was subsequently told first that he was suspended, but then the NYPD reversed itself and placed him on modified duty. (*Id.* ¶¶ 30, 30 n.1.)

In connection with the probe, Commissioner Bratton made public statements that the corruption within the NYPD was "contained" and then "conspired" with Deputy Commissioner Byrne "to terminate and/or force the retirement of certain officers to show that the corruption was contained to a select group of officers." (*Id.* ¶¶ 31–32.) In late April 2016, Plaintiff realized that he "would be a scapegoat for the corruption at the NYPD [and] gave his 30-day notice for retirement." (*Id.* ¶ 33.)

Days after Plaintiff submitted his retirement papers, Defendants ordered an internal hearing for the purpose of "interrogat[ing] Plaintiff [ ] under Patrol Guide Section '206-13' ('PG 206-13 hearing') . . . because the commissioner knew that Plaintiff would not testify due to the ongoing criminal probe, and the refusal to testify at the PG 206-13, was in and of itself a violation of the patrol guide, which would help justify Plaintiff's termination." (*Id.* ¶¶ 35–36.) On advice of counsel, Plaintiff did not appear at the PG 206-13 hearing "because statements from the hearing could be used by prosecutors involved in the criminal probe." (*Id.* ¶ 35.) Commissioner Bratton and Deputy Commissioner Byrne "then filed trumped up internal charges and specifications against [ ] Plaintiff, which included charges related to Plaintiff's failure to appear for the PG 206-13, and on May 18, 2019, Plaintiff was fired." (*Id.* ¶ 37.) As a result of Plaintiff's termination, he was not issued a "Pistol License Inquiry" form, also known as a "good guy letter," which allows a retiree to receive a pistol permit and opens up multiple avenues of employment opportunities for retired officers; Plaintiff also lost his "terminal leave." (*Id.* ¶¶ 38–39.)

3

II.     **"White Shirt" Immunity**

According to Plaintiff, "[t]he NYPD has had a long-standing culture, policy[,] and practice of 'White Shirt Immunity,' the so-called term for allowing more lenient discipline on higher ranked police officers versus lower ranking members for the similar misconduct." (*Id.* ¶ 48; *see also id.* ¶¶ 49–55 (describing examples).) In June 2018, after a number of stories were published "about the lack of uniformity in the way that the NYPD handled internal punishment and the lack of severe discipline to officers who committed serious offenses such as lying in official proceedings or documents," the Commissioner of the NYPD, James O'Neill, organized a panel of experts to review the NYPD's disciplinary practices. (*Id.* ¶ 56.) The panel concluded that there was no basis to find that higher-ranking officers consistently received better treatment in the NYPD's disciplinary system. (*Id.* ¶ 58.) Plaintiff asserts that the conclusion of the panel was "flawed" for a number of reasons: (1) it only examined data from two years (*id.* ¶ 58); (2) the records of certain officers would not have been reviewed since they "were never charged with any internal disciplinary violations because of their political connections" (*id.* ¶ 59); and (3) the panel of experts was biased because it consisted entirely of former federal prosecutors (*id.* ¶ 56). However, the panel did conclude that the Department Advocate who oversees the NYPD's disciplinary process frequently receives outside input through informal communications at NYPD and other events, and that the NYPD's "disciplinary system is susceptible to improper influences or inequities, including in making decisions not to report misconduct at all." (*Id.* ¶¶ 61–62.)

Plaintiff claims that he was treated differently than the "White Shirts," numerous supervising officers within the NYPD who were similarly issued federal grand jury subpoenas as part of the probe and who declined to testify, but who were not subjected to a PG 206-13 hearing or disciplined. (*Id.* ¶¶ 40–42.) The "White Shirts" were allowed a "graceful exit" and retired with

"good guy letters." (*Id.* ¶¶ 43–44.) Their only penalty was that they "were forced to abandon their accrued compensation, vacation[,] and comp[ensation] time." (*Id.* ¶ 44.) The White Shirts also "filed a grievance with the City's Office of Labor Relations over losing their positions," arguing that they were blackmailed into retirement. (*Id.* ¶ 45.) The arbitrator who presided over the grievance proceedings observed that "[t]he [NYPD]'s motive was depicted as a concern about negative publicity, although no one was ever charged with misconduct." (*Id.* ¶ 46 (record citation omitted).) Plaintiff alleges that "the [NYPD]'s motives for getting rid of Plaintiff [were] the same." (*Id.* ¶ 47.) Due to differences in his labor contract from that of the White Shirts, Plaintiff could not challenge his loss of vacation or comp time as a result of his termination. (*Id.*)

### III.    Procedural History

Plaintiff filed the instant action on May 15, 2019, asserting civil rights claims against the individual and municipal Defendants for equal protection violations. (*See generally id.*) On August 2, 2019, Defendants filed a motion for a pre-motion conference in anticipation of their motion to dismiss. (Dkt. 16.) That motion was granted by this Court on August 14, 2019 (Aug. 14, 2019 Order), and a pre-motion conference was held on September 4, 2019 (Sept. 4, 2019 Minute Entry). Defendants' motion to dismiss was fully briefed on January 31, 2020. (Dkts. 28–31.)

### LEGAL STANDARD

### I.    Motion to Dismiss

In order to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (internal citation omitted). "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) (citing *Twombly*, 550 U.S. at 555, 557).

## II.    Qualified Immunity

Courts have an obligation to determine the applicability of a qualified immunity defense at the earliest stage of the litigation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("[The Supreme Court] repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (internal quotation marks and citation omitted)). "Qualified immunity shields officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McCray v. Lee*, 963 F.3d 110, 119 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[A] government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 255 (2d Cir. 2014) (internal quotation marks and alteration omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The operation of the 'clearly established' standard 'depends substantially upon the level of generality at which the relevant

6

"legal rule" is to be identified.'" *McCray*, 963 F.3d at 119 (quoting *Anderson v. Creighton*, 483

U.S. 635, 639 (1987)).  In other words, it is not necessary that "the very action in question has

previously been held unlawful" for an official to be denied immunity.  *Id.* (internal quotation marks

and citations omitted).

## DISCUSSION

### I.     Failure to State a Claim

#### A.     "Class-of-One" Equal Protection Theory

Plaintiff's claims are grounded in a "class-of-one" theory under the Equal Protection

provision of the Fourteenth Amendment.  (*See* Compl., Dkt. 1, ¶¶ 63–71.)[4]  The Supreme Court

---

[4] Although the final transcript of the pre-motion conference is not yet available on the docket, the Court is mindful of the following colloquy it had with Plaintiff's counsel:

> The Court:  The first issue I want to clarify is with you, Mr. George.  Is it correct, as the City has assumed, that your theory of equal protection is a class of one?
>
> Mr. George:  That's correct, Your Honor.
>
> The Court:  Not select[ive] prosecution?
>
> Mr. George:  Correct.
>
> The Court: Okay. So your theory is that somehow, Mr. Milici was treated differently than the officers you colloquially refer to as "the white shirts"?
>
> Mr. George:  Correct, Judge.
>
> The Court:  In terms of [your] termination post this investigation, is that right?
>
> Mr. George:  That's correct, Your Honor.

Although the Court finds Plaintiff's belated attempt to, in the alternative, construe his claims as an equal protection claim stemming from his membership in a "group of non-supervisors" unpersuasive (Pl.'s Br., Dkt. 31, at 3), it nevertheless addresses and finds that, as discussed *infra*, Plaintiff fails to state a claim under that alternative theory.

has essentially eliminated class-of-one equal protection claims in the public employment context.

*See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008).  In *Engquist*, the Court found that

> the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context.  To treat employees differently is not to classify them in a way that raises equal protection concerns.  Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship.  A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.
>
> Of course, that is not to say that the Equal Protection Clause, like other constitutional provisions, does not apply to public employers. . . .  But we have never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner.

*Id.* (internal citations omitted).  The Second Circuit has applied this doctrine to find that class-of-one claims have been "cabined" with respect to government employees.  *Hu v. City of New York*, 927 F.3d 81, 95 (2d Cir. 2019); *see also Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) ("The Supreme Court[] . . . eliminated class-of-one claims for government employees.  In essence, *Engquist* is a jurisdiction-limiting decision."); *Epstein v. County of Suffolk*, No. 14-CV-0937 (JS) (ARL), 2015 WL 5038344, at *11 (E.D.N.Y. Aug. 26, 2015) ("Defendants are correct that the Equal Protection Clause does not apply to public employees, like Plaintiff, who are asserting a class-of-one theory of discrimination.  Thus, such an argument is foreclosed in this case." (citation omitted)); *Mancuso v. Village of Pelham*, No. 15-CV-7895 (KMK), 2016 WL 5660273, at *13 (S.D.N.Y. 2013) ("As a probationary firefighter employed by the Village, and thus a public employee, Plaintiff cannot state a valid class-of-one claim against Defendants." (internal quotation marks and record citation omitted)).  For this reason alone, Plaintiff fails to

state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6); *Iqbal*, 556 U.S. at 678.

However, even if Plaintiff's class-of-one claim was not unequivocally barred by Supreme Court and Second Circuit precedent, it would fail.  To establish a class-of-one claim a plaintiff must allege that "he and a comparator are prima facie identical."  *Hu*, 927 F.3d at 92 (internal quotation marks and citation omitted).  This is accomplished

> by showing that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Id.* (internal quotation marks and citation omitted).  The Second Circuit "explained that the existence of highly similar circumstances provides the basis for inferring that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain."  *Id.* (internal quotation marks, citation, and alteration omitted).

Plaintiff has simply not alleged any degree of similarity, no less a high degree of similarity, between him and the "White Shirts," whom he alleges were treated more favorably than him.  By his own admission, Plaintiff (1) was a different rank than the "White Shirts" (Compl., Dkt. 1, ¶ 8); (2) was governed by a different labor contract than the "White Shirts" (*id.* ¶ 47); (3) violated the NYPD Patrol Guide by disobeying an order to participate in a PG 206-13 hearing, which the "White Shirts" were not ordered to do in exchange for resigning and forfeiting certain benefits (*id.* ¶¶ 35–36, 41–42); and (4) was subject to a disciplinary proceeding as a result of his non-compliance with the PG 206-13 hearing order (*id.* ¶ 37).

For these reasons, Plaintiff's equal protection class-of-one claim fails to state a claim upon which relief may be granted and is dismissed.

### B.   "Group Theory"

Plaintiff, in his reply brief, asserts that even if he were not able to state an equal protection claim under a class-of-one theory, his equal protection claims flow from his membership in a class or group and that he "has sufficiently pleaded that the disparate impact in treatment that he endured was a result of being part of a larger group of NYPD officers who are not high-ranking supervisors or 'White Shirts.'"  (Pl.'s Br., Dkt. 31, at 3.)  For the reasons discussed *supra* in note 4, the Court finds that Plaintiff did not assert this claim in his complaint, at all, which Plaintiff confirmed at the pre-motion conference relating to this motion.  Moreover, Plaintiff's complaint does not contain a single allegation that he was part of a group that was treated differently (*see generally* Compl., Dkt. 1); every single comparison posited by Plaintiff compared *his* treatment with that of the "White Shirts" (*see id.* ¶¶ 40–44, 47, 65–66).

However, even assuming *arguendo* that Plaintiff has pleaded that non-supervisor officers at the NYPD were treated differently than supervisors or "White Shirts," his claim fails.  "The disparate impact theory of liability is not available for Section 1983 equal protection claims because proof of discriminatory intent is required to demonstrate a violation of the Equal Protection Clause, whereas disparate impact theory bases liability on discriminatory effect alone." *Jones v. E. Hartford Police Dep't*, No. 13-CV-1007 (WWE), 2016 WL 1273170, at *8 (D. Conn. Mar. 31, 2016) (citing *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012)); *see also Lebada v. N.Y.C. Dep't of Educ.*, No. 14-CV-758 (LAK) (GWG), 2016 WL 626059, at *15 (S.D.N.Y. Feb. 8, 2016) ("[T]o the extent plaintiffs are trying to make a disparate impact claim, any such claim is impermissible. . . .  [A] plaintiff pursuing . . . a denial of equal protection under § 1983 must show that the discrimination was intentional[.]" (internal quotation marks omitted) (citing, *inter alia*,

*Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)), *report and recommendation adopted*, 2016 WL 8453417 (S.D.N.Y. May 16, 2016). Thus, Plaintiff's disparate impact theory fails to state an Equal Protection claim under § 1983.

> **C.**     ***Monell* Claim**

The Court also dismisses Plaintiff's second claim for relief—a *Monell* claim for municipal liability. "It is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation." *Mastromonaco v. County of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) (summary order) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

## II.     Qualified Immunity

Finally, the Court finds that, even if Plaintiff were able to state a claim upon which relief may be granted, the individual Defendants would be entitled to qualified immunity. First, Plaintiff has failed to "show[] facts making out [a] violation of a constitutional right," a threshold question in a qualified immunity analysis. *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). Second, qualified immunity shields officers from liability when they make "reasonable" mistakes of fact or law. *See Jones v. Treubig*, 963 F.3d 214, 234 (2d Cir. 2020). For all the reasons discussed *supra*, it would have been reasonable for the individual Defendants to have believed that Plaintiff was not protected by the Equal Protection provisions in the public employment context.

**CONCLUSION**

For all of the reasons contained herein, Defendants' motion is granted in its entirety, and

this case is dismissed.  The Clerk of Court is respectfully requested to enter judgment and close

this case.

                                        SO ORDERED.

                                        /s/ Pamela K. Chen
                                        Pamela K. Chen
                                        United States District Judge

Dated:  August 14, 2020
        Brooklyn, New York